PERRY, J.
Gayle Shotts, personal representative of the estate of Edward Henry Clark, seeks review of the decision of the Second District Court of Appeal in Shotts v. OP Winter Haven, Inc., 988 So.2d 639 (Fla. 2d DCA 2008), on the grounds that it expressly and directly conflicts with a decision of another Florida district court of appeal on a question of law. We have jurisdiction. See art. V, § 3(b)(3), Fla. Const.
Edward Clark was involved in an automobile accident in 1977, and he sustained brain damage. For many years, Clark’s care was provided by his niece, Gayle Shotts, in her home. Eventually, Clark was admitted to OP Winter Haven, Inc.,[1] a nursing home in Florida. He remained there until his death in 2003, at which time Shotts, as his personal representative, filed a complaint against OP Winter Haven alleging negligence and breach of fiduciary duties. OP Winter Haven moved to compel arbitration based on an agreement Shotts had signed on Clark’s admission. The agreement contained the following “limitations of remedies” provisions: (i) the arbitration will be conducted in accordance with the American Health Lawyers Association (AHLA) rules; and (ii) the arbitrators will have no authority to award punitive damages. The agreement also stated that its terms were severable. At the hearing on the motion to compel, Shotts argued that the agreement was unenforceable because it was unconscionable and violated public policy. The trial court granted the motion, and the district court affirmed. Shotts sought discretionary review, which we granted.
Shotts raises several issues, including the following: (1) whether the court or the arbitrator must decide whether the arbitration agreement violates public policy; (2) whether the limitations of remedies provisions violate public policy; and (3) whether the limitations of remedies provisions are severable. OP Winter Haven, in *459 counterpoint, contends that the United States Supreme Court’s recent decision in Rent-A-Center, West, Inc. v. Jackson, — U.S. —, 130 S.Ct. 2772, 177 L.Ed.2d 403 (2010), is applicable here and entitles OP Winter Haven to relief on its motion to compel.
First, as explained more fully below, we hold that the district court below erred in failing to rule that the court, not the arbitrator, must decide whether the arbitration agreement violates public policy. This Court in Seifert v. U.S. Home Corp., 750 So.2d 633 (Fla.1999), held that it was for the court, not the arbitrator, to determine “whether a valid written agreement to arbitrate exists.” Id. at 636. Later, this Court in Global Travel Marketing, Inc. v. Shea, 908 So.2d 392 (Fla.2005), explained the meaning of the term “valid” in this context: “No valid agreement exists if the arbitration clause is unenforceable on public policy grounds.” Id. at 398. Thus, it is for the court, not the arbitrator, to determine whether an arbitration agreement “is unenforceable on public policy grounds.”
Second, we hold that the district court below erred in failing to rule that the limitations of remedies provisions in this case violate public policy, for they directly undermine specific statutory remedies created by the Legislature. See §§ 400.022, 400.023, Fla. Stat. (2003). In light of the recognized need for these remedies and the salutary purpose they serve, we conclude that any arbitration agreement that substantially diminishes or circumvents these remedies stands in violation of the public policy of the State of Florida and is unenforceable. This conclusion comports ■with the vast weight of authority in Florida, as explained below.
Third, we hold that the district court below erred in ruling that the limitations of remedies provision that calls for imposition of the AHLA rules is severable. Although the agreement in this case contains a severability clause, the AHLA provision goes to the very essence of the agreement. If the provision were to be severed, the trial court would be forced to rewrite the agreement and to add an entirely new set of procedural rules and burdens and standards, a job that the trial court is not tasked to do. See Local No. 234 v. Henley & Beckwith, Inc., 66 So.2d 818, 821-22 (Fla.1953). Further, if the provision were to be severed, the trial court would be hard pressed to conclude with reasonable certainty that, with the illegal provision gone, “there still remains of the contract valid legal promises on one side which are wholly supported by valid legal promises on the other” id. — particularly, when those legal promises are viewed through the eyes of the contracting parties. See generally id. at 822.
And finally, we conclude that the United States Supreme Court’s recent decision in Rent-A-Center, West, Inc. v. Jackson, — U.S. -, 130 S.Ct. 2772, 177 L.Ed.2d 403 (2010), is inapplicable here. Approximately two weeks after this Court heard oral argument in the present case, the United States Supreme Court issued its decision in Jackson, in which that Court addressed the issue of whether the court or the arbitrator must determine whether an arbitration agreement is unconscionable (Jackson claimed that the agreement was unconscionable because it required the splitting of arbitration fees) where the agreement contained a provision, known as a delegation provision, in which the parties specifically agreed to arbitrate the enforceability of the arbitration agreement. The United States Supreme Court held that, where there has been no specific challenge to the delegation provision, the arbitrator, not the court, must decide the issue. In the present case, because the arbitration *460 agreement contains no delegation provision, Jackson is inapplicable.
I. BACKGROUND
The relevant facts of this case are set forth in the district court decision under review:
Gayle Shotts, as personal representative of the estate of her uncle, Edward Henry Clark, appeals the nonfinal order granting the motion to compel binding arbitration filed by the defendants below: OP Winter Haven, Inc.; RE Winter Haven, Inc.; Tandem Regional Management of Florida, Inc.; Tandem Health Care, Inc.; Gail Ward a/k/a Gail Lurie Ward; Nancy C. Thompson; Michael Bradley; and Irena Blackburn a/k/a Irena Tarran Blackburn (as to Tandem Health Care Of Winter Haven) (hereinafter collectively “Tandem”)....
In 1977, Mr. Clark was involved in an automobile accident, and he sustained brain damage. He required twenty-four-hour-a-day care. For many years, Mr. Clark’s care was provided by his niece, Ms. Shotts, in her home. Eventually he was placed in a nursing home. Thereafter, on May 23, 2003, Mr. Clark was moved from the nursing home and admitted to Tandem Health Care of Winter Haven. He remained there until his death on November 23, 2003.
Ms. Shotts, as personal representative, filed a complaint against the defendants alleging negligence and breach of fiduciary duties. The complaint contained a claim for wrongful death and an alternative claim for injuries not resulting in death. At least at this point, Ms. Shotts has not sought to amend the complaint to allege punitive damages.
In response to the complaint, Tandem moved to compel arbitration based on an arbitration agreement executed by Ms. Shotts on behalf of her uncle. In her memorandum in opposition to arbitration, and at the hearing conducted to consider the motion, Ms. Shotts argued that the agreement was not valid and enforceable because it was unconscionable and violated public policy. The trial court found no merit in Ms. Shotts argument and granted the motion to compel. It concluded that the agreement was “enforceable, not severable and not repugnant to the public policy of the State of Florida.”
Shotts v. OP Winter Haven, Inc., 988 So.2d 639, 640-41 (Fla. 2d DCA 2008) (footnote omitted) (citation omitted).
The arbitration agreement that Shotts signed on behalf of her uncle included the following terms:
—The arbitration shall be conducted ... in accordance with the American Health Lawyers Association (‘AHLA”) Alternative Dispute Resolution Service Rules of Procedure for Arbitration....
—All fees of the arbitrators shall be borne equally between the parties.
—All matters relating the arbitration ... shall remain confidential between the parties.

—[T]he parties expressly agree that this Agreement will be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16 (“FAA”).

—The parties agree that damages awarded, if any, in an arbitration conducted pursuant to this Binding Arbitration Agreement shall be determined in accordance with the provision of Florida law applicable to a comparable civil action, except that the parties acknowledge that the arbitrators shall have no authority to award punitive damages or any other damages not measured by the prevailing party’s actual damages....
—In the event that any portion of this Agreement will be determined to be in *461 valid or unenforceable, the remainder of this agreement will be deemed to continue to be binding upon the parties hereby in the same manner as if the invalid or unenforceable provision were not a part of the Agreement.
—The execution of this Agreement is not a precondition to receiving medical treatment or for admission to the Facility-
—The resident has the right to seek legal counsel concerning this Agreement.
(Emphasis added.)
Shotts appealed, and the district court affirmed the trial court’s ruling on the motion to compel, concluding as follows with respect to the public policy issue:
In summary, the trial court correctly found that the arbitration agreement was not unconscionable. It is possible, especially if Ms. Shotts pursues a claim for punitive damages, that portions of the arbitration agreement could be found to be against public policy; however, the trial court erred when it concluded that the arbitration agreement was not severable. Accordingly, because the arbitrators will have the ability to sever any offending clauses of the arbitration agreement, we affirm the trial court’s order granting the motion to compel and remand this case for further proceedings.
Shotts, 988 So.2d at 644. Shotts sought discretionary review in this Court, which the Court granted. Shotts raises several claims,[2] and we address three of them.[3]
II. COURT OR ARBITRATOR
In this claim, Shotts contends that the district court erred in remanding this case so that the arbitrator, not the court, could decide whether the arbitration agreement violates public policy. The issue presented in this claim is a pure question of law, subject to de novo review. See Aills v. Boemi, 29 So.3d 1105, 1108 (Fla.2010) (“Because this is a question of law ... the standard of review is de novo.”). Arbitration law that affects interstate commerce in Florida is governed by two acts— the Federal Arbitration Act, see 9 U.S.C. §§ 1-16 (2006), and the Florida Arbitration Code. See ch. 682, Fla. Stat. (2003). Shotts contends that under these acts, it is the court, not the arbitrator, that must decide the public policy issue. We agree.
A. Federal Arbitration Act
The Federal Arbitration Act (FAA), which was originally enacted in 1925 and then reenacted and codified in 1947 as title 9 of the United States Code, see 9 U.S.C. §§ 1-16 (2006), was intended *462 to reverse the longstanding judicial hostility toward arbitration that had existed at English common law and that had been imported by American courts. See Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). The FAA was intended to place arbitration agreements on the same footing as other contracts. Id. The FAA’s primary substantive provision is contained in section 2, which provides as follows:
A written provision in any ... contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.
9 U.S.C. § 2 (emphasis added).
In enacting section 2, “Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration.” Southland Corp. v. Keating, 465 U.S. 1, 10, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984). Congress provided enforcement mechanisms within the FAA — notably in sections 3 and 4 — to implement section 2’s substantive rule.
Under § 3, a party may apply to a federal court for a stay of the trial of an action “upon any issue referable to arbitration under an agreement in writing for such arbitration.” Under § 4, a party “aggrieved” by the failure of another party “to arbitrate under a written agreement for arbitration” may petition a federal court “for an order directing that such arbitration proceed in the manner provided for in such agreement.”
Rent-A-Center, West, Inc. v. Jackson, — U.S. -, 130 S.Ct. 2772, 2777, 177 L.Ed.2d 403 (2010).
The United States Supreme Court recognizes only two limitations on the enforceability of arbitration agreements governed by the FAA, and it is the latter limitation that is of import here:
We discern only two limitations on the enforceability of arbitration provisions governed by the Federal Arbitration Act: [1] they must be part of ... a contract “evidencing a transaction involving commerce” and [2] such clauses may be revoked upon “grounds as exist at law or in equity for the revocation of any contract.” We see nothing in the Act indicating that the broad principle of enforceability is subject to any additional limitations under State law.
Southland, 465 U.S. at 10-11, 104 S.Ct. 852 (emphasis added) (footnote omitted). The United States Supreme Court in Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006), explained the latter limitation more fully:
Challenges to the validity of arbitration agreements “upon such grounds as exist at law or in equity for the revocation of any contract” can be divided into two types. One type challenges specifically the validity of the agreement to arbitrate. The other challenges the contract as a whole, either on a ground that directly affects the entire agreement (e.g., the agreement was fraudulently induced), or on the ground that the illegality of one of the contract’s provisions renders the whole contract invalid.
Buckeye, 546 U.S. at 444, 126 S.Ct. 1204 (citation omitted).
*463 The Court in Buckeye reviewed its own precedent and then clarified the procedures for resolving the two types of challenges to arbitration agreements:
In Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395 [87 S.Ct. 1801, 18 L.Ed.2d 1270] (1967), we addressed the question of who — court or arbitrator — decides these two types of challenges. The issue in the case was “whether a claim of fraud in the inducement of the entire contract is to be resolved by the federal court, or whether the matter is to be referred to the arbitrators.” Id., at 402 [87 S.Ct. 1801]. Guided by § 4 of the FAA, we held that “if the claim is fraud in the inducement of the arbitration clause itself — an issue which goes to the making of the agreement to arbitrate — the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally.” Id., at 403-404 [87 S.Ct. 1801] (internal quotation marks and footnote omitted). We rejected the view that the question of “severability” was one of state law, so that if state law held the arbitration provision not to be severable a challenge to the contract as a whole would be decided by the court.
Subsequently, in Southland Corp., we held that the FAA “create[d] a body of federal substantive law,” which was “applicable in state and federal courts.” We rejected the view that state law could bar enforcement of § 2, even in the context of state-law claims brought in state court.
Buckeye, 546 U.S. at 444-45, 126 S.Ct. 1204 (footnote omitted) (citations omitted).
The Court in Buckeye articulated three key principles to guide courts in reviewing challenges to arbitration agreements, and again, it is the second principle that is of particular import here:
First, as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract. Second, unless the challenge is to the arbitration clause itself, the issue of the contract’s validity is considered by the arbitrator in the first instance. Third, this arbitration law applies in state as well as federal courts.
Buckeye, 546 U.S. at 445-46, 126 S.Ct. 1204 (emphasis added).
And finally, the United States Supreme Court in Doctor's Associates, Inc. v. Casarotto, 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996), articulated a fundamental tenet of the FAA: “Courts may not ... invalidate arbitration agreements under state laws applicable only to arbitration provisions. Allied-Bruce [Terminix Cos. v. Dobson, 513 U.S. 265, 281, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995)]; Perry [v. Thomas, 482 U.S. 483, 493, n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987)]. By enacting § 2, we have several times said, Congress precluded States from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed ‘upon the same footing as other contracts.’ Scherk v. Alberto-Culver Co., 417 U.S. 506, 511 [94 S.Ct. 2449, 41 L.Ed.2d 270] (1974) (internal quotation marks omitted).” In Casarotto, the United States Supreme Court held that the FAA displaced a Montana statute that required that a special notice provision must be placed on the first page of all contracts containing an arbitration clause, but not on the first page of all contracts in general, thus singling out arbitration contracts for special treatment.
B. Florida Arbitration Code
In Florida, an arbitration clause in a contract involving interstate commerce is subject to the Florida Arbitration Code (FAC), to the extent the FAC is not in *464 conflict with the FAA. This Court in Seifert v. U.S. Home Corp., 750 So.2d 633 (Fla.1999), held that, in a hearing on a motion to compel arbitration, the inquiry follows the same three-step process regardless whether the inquiry is conducted under the FAC or the FAA:
Under both federal statutory provisions and Florida’s arbitration code, there are three elements for courts to consider in ruling on a motion to compel arbitration of a given dispute: (1) whether a valid written agreement to arbitrate exists; (2) whether an arbitra-ble issue exists; and (3) whether the right to arbitration was waived.
Seifert, 750 So.2d at 636.
Challenges to arbitration agreements in Florida generally focus on the first of the Seifert elements — “whether a valid written agreement to arbitrate exists”:
Today, arbitration provisions are common, and their use generally favored by the courts. However, because arbitration provisions are contractual in nature, construction of such provisions and the contracts in which they appear remains a matter of contract interpretation. See Seaboard Coast Line R.R. v. Trailer Train Co., 690 F.2d 1343, 1352 (11th Cir.1982). Accordingly, the determination of whether an arbitration clause requires arbitration of a particular dispute necessarily “rests on the intent of the parties.” Seaboard, 690 F.2d at 1348; see also Regency Group, Inc. v. McDaniels, 647 So.2d 192, 193 (Fla. 1st DCA 1994) (“The agreement of the parties determines the issues subject to arbitration.”). A natural corollary of this rule is that no party may be forced to submit a dispute to arbitration that the party did not intend and agree to arbitrate. See Seaboard Coast Line, 690 F.2d at 1352 (holding that the federal policy favoring arbitration “cannot serve to stretch a contract beyond the scope originally intended by the parties”); see also Miller v. Roberts, 682 So.2d 691, 692 (Fla. 5th DCA 1996) (“The general rule is that where an arbitration agreement exists between the parties, arbitration is required only of those controversies or disputes which the parties have agreed to submit to arbitration.”); Regency Group, Inc., 647 So.2d at 193 (“Only those claims which the parties have agreed are arbitrable may be subject to arbitration.”).
Seifert, 750 So.2d at 636 (citations omitted).
The issue of “whether a valid written agreement to arbitrate exists” is controlled by principles of state contract law:
Although the states may not impose special limitations on the use of arbitration clauses, the validity of an arbitration clause is nevertheless an issue of state contract law. Section 2 states that an arbitration clause can be invalidated on such grounds as exist “at law or in equity for the revocation of a contract.” Thus, an arbitration clause can be defeated by any defense existing under the state law of contracts. As the [United States Supreme] Court explained in [Doctor’s Associates, Inc. v. Casarotto, 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996)], “generally applicable contract defenses, such as fraud, duress or unconscionability, may be applied to invalidate arbitration agreements without contravening [the Federal Arbitration Act].”
Powertel, Inc. v. Bexley, 743 So.2d 570, 574 (Fla. 1st DCA 1999) (emphasis added).
With respect to which contract defenses — besides “fraud, duress or uncon-scionability” — constitute “generally applicable contract defenses” for purposes of section 2, we conclude that public policy *465 clearly is such a defense, for if an arbitration agreement violates public policy, no valid agreement exists. “[T]he rights of access to courts and trial by jury may be contractually relinquished [via an arbitration agreement], subject to defenses to contract enforcement including voidness for violation of the law or public policy, unconscionability, or lack of consideration .... No valid agreement exists if the arbitration clause is unenforceable on public policy grounds.” Global Travel Marketing, Inc. v. Shea, 908 So.2d 392, 398 (Fla.2005) (emphasis added) (citations omitted).
C. Florida Case Law
Although this Court has not confronted the specific issue of whether the court or the arbitrator must decide whether an arbitration agreement violates public policy, the Court in Seifert has ruled that it is for the court, not the arbitrator, to decide “whether a valid written agreement to arbitrate exists.” Seifert, 750 So.2d at 636 (emphasis added). Later, this Court explained the meaning of the term “valid” in this context: “No valid agreement exists if the arbitration clause is unenforceable on public policy grounds.” Global Travel, 908 So.2d at 398. Thus, under Seifert and Global Travel, it is for the court, not the arbitrator, to decide whether an arbitration agreement violates public policy.
Florida’s district courts have addressed the public policy issue frequently in this context, and the decisions of those courts vary. The Second District Court of Appeal, on the one hand, has indicated that it is the arbitrator who must decide whether an arbitration agreement violates public policy. This position originated in a non-nursing home, non-public policy ease, Rollins, Inc. v. Lighthouse Bay Holdings, Ltd., 898 So.2d 86 (Fla. 2d DCA 2005), where the Second District Court of Appeal addressed the issue of whether an arbitration agreement in a termite contract was unconscionable because it imposed limitations on statutory remedies. The trial court had ruled that the agreement was unconscionable. The district court reversed, ruling that the trial court erred in deciding the issue at all.
In conducting its analysis in Rollins, the Second District Court of Appeal relied almost exclusively on federal precedent, reasoning as follows:
In considering how to answer [this question], we have looked to the decisions of the federal circuit courts that have confronted these issues. The consensus among those courts is that the arbitrator should decide in the first instance whether particular remedial limitations are permissible. See [PacifiCare Health Systems, Inc. v. Book, 538 U.S. 401, 407, 123 S.Ct. 1531, 155 L.Ed.2d 578 (2003)]; Hawkins v. Aid Ass’n For Lutherans, 338 F.3d 801, 807 (7th Cir.2003) (holding that the adequacy of arbitration remedies has nothing to do with whether the parties agreed to arbitrate or if the claims are in the scope of the arbitration agreement and thus they must first be considered by the arbitrator); Bob Schultz Motors, Inc. v. Kawasaki Motors Corp., 334 F.3d 721, 726 (8th Cir.2003) (holding that the party seeking to void remedial limitations on punitive damages and other relief has to address those arguments to the arbitrator); MCI Telecomms. Corp. v. Matrix Comms. Corp., 135 F.3d 27, 33, n. 12 (1st Cir.1998) (stating that an argument that an arbitration agreement is invalid because it forecloses certain remedies otherwise available “must be brought to the arbitrator because it does not go to the arbitrability of the claims but only to the nature of available relief’); Great W. Mortgage Corp. v. Peacock, 110 F.3d 222, 232 (3d *466 Cir.1997) (stating that “[t]he availability of punitive damages is not relevant to the nature of the forum in which the complaint will be heard. Thus, availability of punitive damages cannot enter into a decision to compel arbitration”). But see Paladino v. Avnet Computer Techs., Inc., 134 F.3d 1054 (11th Cir.1998) (holding that the arbitrability of statutory claims rests on the assumption that the arbitration clause permits relief equivalent to court remedies and pronouncing an arbitration clause unenforceable where it had provisions that deprived the plaintiff of the ability to obtain meaningful relief for allegations of statutory violations). Even the Eleventh Circuit, which declared an arbitration provision with remedial limitations unenforceable in Paladino, appears to be rethinking its decision in that case and has limited its holding. Specifically, in Anders v. Hometown Mortgage Services, Inc., 346 F.3d 1024 (11th Cir.2003), the court held that where the parties’ agreement contains remedial limitations, but also contains a severability clause that permits any invalid provisions to be excised, the question of the validity of the remedial limitations is for the arbitrator to decide. The court reasoned that the presence of the sever-ability provision evidenced the parties’ intention to enforce the remainder of the agreement in the event any portion of it is deemed invalid. Id. at 1031. The court concluded that because any invalid provisions were severable, the underlying claims should be arbitrated regardless of the validity of the remedial restrictions. Id. at 1032. The court also noted that the case was going to arbitration, thus, an arbitrator and not the court should decide the validity of the remedial limitations because “[a] court compelling arbitration should decide only such issues as are essential to defining the nature of the forum in which a dispute will be decided.” Id. at 1032-33 (quoting Musnick v. King Motor Co. of Ft. Lauderdale, 325 F.3d 1255, 1261 (11th Cir.2003)).
In light of these authorities, we conclude that this case should be arbitrated and that the arbitrator should in the first instance decide the validity of the remedial restrictions in the arbitration provision. We believe that this approach is consistent with the policy Congress sought to advance with the FAA. It also seems wise given that at this stage in the proceedings we can only speculate whether Lighthouse Bay will ever be affected by the remedial limitations of which it complains. That will depend in part on whether Lighthouse Bay prevails on its claim, and it will also depend on how the arbitrator construes provisions in the contract outside the arbitration provision. We also note that the agreement in this case contains a severability clause. Thus, even under the approach taken by the Eleventh Circuit, this case should proceed to arbitration.
Rollins, 898 So.2d at 88-89. Bound by its decision in Rollins, the Second District Court of Appeal later applied the same rationale to nursing home and public policy cases.[4] That court now has acknowledged, however, that its rationale is in conflict with the decisions of the other Florida district courts.[5]
*467 In counterpoint to the above position of the Second District Court of Appeal, other Florida district courts of appeal have taken a different approach to the public policy-issue. The First District Court of Appeal, Fourth District Court of Appeal, and Fifth District Court of Appeal all hold that the court, not the arbitrator, must make the initial decision as to whether an arbitration agreement violates public policy.[6] A rationale supporting this position is expressed in the specially concurring opinion of Judge Altenbernd in ManorCare Health Services, Inc. v. Stiehl, 22 So.3d 96 (Fla. 2d DCA 2009). There, Judge Altenbernd voiced his misgivings about the position that his own court, the Second District Court of Appeal, had taken on the issue. Stiehl is a nursing home case in which the district court remanded with directions that the arbitrator, not the court, decide whether the remedial limitations in the agreement violated public policy. The remedial limitations included a $250,000 cap on noneconomic damages and a waiver of punitive damages.
Judge Altenbernd wrote at length in Stiehl, explaining why, in his view, the Second District Court of Appeal should abandon its position on this issue and adopt the approach of the other district courts:
I concur in this decision because it is consistent with the existing precedent from this district. I have come to the conclusion, however, that it is both bad policy and bad law to allow an arbitrator to make case-specific, non-prece-dential, confidential decisions about the enforceability of clauses in an arbitration agreement when those clauses limit or eliminate rights specially created by the legislature to protect nursing home residents. Accordingly, I would prefer to follow the approach of the other districts and permit trial courts to make decisions about these restrictive clauses prior to arbitration.
The language of this specific arbitration agreement heightens my concerns. I do not question the value of arbitration as an alternate dispute mechanism for use in nursing home cases, but I believe the time has come for the legislature to regulate the content of such agreements — which should primarily provide dispute resolution procedures — because they are actually being used to eliminate *468 substantive rights and remedies created by the Legislature in sections 400.022 and 400.023, Florida Statutes, for the protection of some of our most vulnerable citizens. If the legislature could establish a method by which approved, standard arbitration agreements, fair to both sides, were available for use by nursing homes and their residents in Florida, we could largely eliminate the seemingly endless supply of lawsuits and appeals addressing the language of arbitration agreements that ironically were intended to eliminate lawsuits and appeals.
[[Image here]]
The arbitration agreement in this case ... is well written. It is further explained in a short information pamphlet provided by Manor Care. There is nothing to suggest that this agreement or the methods by which the resident is bound by this agreement are procedurally unconscionable. On the other hand, the drafters of this agreement do not disclose the very limited benefit of this agreement to the resident and the considerable benefit received by Manor Care. A careful review of the agreement causes one to wonder why any resident who actually understood the agreement, assuming it is voluntary and does not affect the price of care at the facility, would ever sign such a one-sided arrangement. There is a good argument that the agreement is substantively unconscionable, but that is irrelevant in this district so long as it is not proeedurally unconscionable.
The agreement is repeatedly described as “voluntary,” and the resident or resident’s agent is assured that the “signing” of this agreement is not “mandatory.” However, if voluntarily signed, it creates mandatory, binding arbitration subject to extremely limited rights of appeal. It is not a voluntary agreement in the sense that the parties decide whether to use the program only after a claim has arisen; it applies mandatorily to all future disputes.
The benefit of this agreement is described in the first paragraph as helping the parties “avoid crowded court dockets and lengthy appellate procedures.” Not only has that benefit not been achieved in this case and the many cases in which the parties fight over the content of the arbitration agreement, but also the first paragraph does not really explain the detriments of signing the agreement. The resident is told in bold print that it does contain a waiver of statutory rights and that it should be read carefully, but a brief description of the rights waived and the consideration for that waiver, which easily could be recited, is not recited.
The benefits for the parties and the primary substantive consideration for this agreement appear to be provided in section 1.2 of the Limitation of Liability. The benefit for the resident appears to be that, if a dispute arises over unpaid nursing home charges, Manor Care agrees not to make a claim for prejudgment interest on those charges. The benefit for Manor Care is that non-economic damages are capped at $250,000, and punitive damages can never be awarded no matter how egregious the violation of the nursing home resident’s rights. Intuitively, this does not appear to be an agreement in which both sides are receiving equivalent economic benefit.
The imbalance, however, is perhaps more pronounced within the arbitration procedures. The procedures require an extensive document production prior to arbitration, but only a designated expert may be deposed. Thus, if Manor Care brings a claim for unpaid nursing home *469 charges, the resident has no ability to depose anyone in the billing department. It seems highly unlikely that employees of Manor Care will be willing to give voluntary statements against the interest of their employers to the attorneys representing a resident. Of even greater concern, if a resident has an accident in the facility, he or she will be unable to depose employees and other witnesses prior to arbitration. As a result, it may be impossible even to obtain sufficient information to provide to an expert so that the expert can reach an opinion. Given that residents tend to be elderly, frail, and forgetful, there is a real risk that a resident making a claim in arbitration will never be able to obtain useful statements from other residents for use in these proceedings, and compelling such resident witnesses to attend arbitration may not be feasible. The arbitration agreement does not explain that the resident is avoiding crowded court dockets and lengthy appeals by agreeing to procedures that significantly reduce the resident’s ability to prevail in the dispute.
[[Image here]]
In this district, we have decided that arbitrators in nursing home cases should decide on the validity of remedial limitations. In the context of a dispute between two large corporations that have agreed to use arbitration to resolve disputes arising out of a unique contract, that approach seems workable. However, in the context of a dispute between a corporation that essentially has physical custody of an elderly person and that person’s guardian, when the dispute arises not from contract law, but from special rights created by the legislature for the protection of the elderly, and when the contract is not a unique contract negotiated on a level playing field, but a form contract applicable to a large group of senior citizens, I think it is a mistake to delegate these legal decisions to the arbitrator.
If a trial judge decides that a clause of the arbitration agreement is enforceable or unenforceable, the order is a public order and an aggrieved party can appeal that ruling. The district court can review the order, and whether the district court affirms or reverses, it can create precedent that resolves the matter for future similar claims. If the agreement needs to be refined for future residents, the drafters have guidance, and if the legislature concludes that the court has misinterpreted the rights it created, the statute can be amended.
If an arbitrator makes a similar decision, the parties have agreed to maintain the confidentiality of the arbitrator’s “conclusions of law.” The agreement prevents an appeal, and the limited judicial review in circuit court permitted by section 682.13 will not permit a judicial review of such a ruling. Not only does this procedure prevent the creation of binding precedent, it creates nothing approaching the rule of law.
For example, hypothetically, if a fire breaks out in a care facility due to the extraordinary negligence of the corporate owner under circumstances that would warrant punitive damages in circuit court and that fire kills five residents, they are likely to present then-cases to five different arbitrators. In this hypothetical, two arbitrators decide to override the agreement and permit punitive damages to be awarded. Three do not. Two arbitrators enforce all of the limitations, and one eliminates the cap on non-monetary damages but maintains the prohibition on punitive damages. Only the nursing home corporation will know that the results were so different and resulted in vastly different *470 awards. None of the rulings will bind any future claims. No one will have a right to appeal or challenge the different rules of law applied to the same circumstances under the same statutory and contractual law. In passing the bill of rights for nursing home residents, the Legislature cannot conceivably have envisioned such a result.
If anything, the “nonseverability” clause in this agreement makes this court’s approach to this issue more troublesome. The “nonseverability” clause provides that either party may cancel the agreement — even after an arbitrator has announced his or her ruling — if the arbitrator determines that any provision of the agreement is unenforceable. It is not obvious to me that Manor Care would ever argue that a portion of the arbitration agreement that it drafted was unenforceable. Thus, only when a resident prevails before the arbitrator on the enforceability of some clause will the agreement become voidable. Thus, in the above examples, in the two cases where the arbitrators awarded punitive damages, the nursing home will undoubtedly choose to cancel the agreement. At that point, the resident must file a lawsuit. In the two cases where all of the limiting provisions were enforced, in light of confidentiality, the corporation will pay the claims and the residents will never have a right to know that the other residents’ cases were referred to the courts. For the residents, on first examination, the “nonseverability” clause might appear bilateral, but in application it appears to benefit Manor Care exclusively.
[[Image here]]
There are now over thirty-five written appellate opinions in Florida addressing arbitration agreements between nursing home operators and their residents. Unquestionably there are many appeals involving these agreements that have not resulted in written opinions and even more challenges at the trial court level that did not result in appeals. Arbitration was intended to create a speedy and economically efficient dispute resolution process for the residents of nursing homes. Instead, it has tended to create a round of time-consuming, expensive litigation prior to whatever dispute resolution method ultimately resolves the case. It is only human that the nursing home facilities have tended to create arbitration agreements that favor the nursing homes. In the case of the relationship between insurance companies and their insured Florida families, we have created regulations to level the playing field and protect the property rights of our families while recognizing the legitimate needs of the insurance companies. It seems to me that we have reached a point where the human rights of our senior citizens deserve no less. The judiciary is ill-equipped to provide that protection, but the Legislature could do so with ease.
Stiehl, 22 So.3d at 101-05 (Altenbernd, J., concurring specially) (footnotes omitted) (citations omitted).
And finally, with respect to the adverse conditions under which nursing home arbitration agreements are often signed, Judge Altenbernd wrote:
Even when residents are given ample time and opportunity to review these form contracts, the reality is that the resident is often significantly incapacitated and may not be competent to sign the agreement. A spouse, son, or daughter, relying on a power of attorney to sign for the resident, is often under time constraints to find a safe facility for a loved one during a very emotional time. Thus, in an unregulated market, *471 these circumstances do not lend themselves to the natural creation of a level playing field.
Stiehl, 22 So.3d at 103 n. 5 (Altenbernd, J., concurring specially).
D. The Present Case
As noted above, this Court in Sei-fert held that it was for the court, not the arbitrator, to determine “whether a valid written agreement to arbitrate exists,” Seifert, 750 So.2d at 636 (emphasis added), and we later explained the meaning of the term “valid” in this context, with respect to arbitration and public policy: “No valid agreement exists if the arbitration clause is unenforceable on public policy grounds.” Global Travel, 908 So.2d at 398. Thus, under Seifert and Global Travel, it is incumbent on the court, not the arbitrator, to determine whether an arbitration agreement violates public policy. This conclusion is consistent with the vast weight of authority in Florida, as discussed above.
Further, we conclude that the rationale expressed by Judge Altenbernd in his specially concurring opinion in Stiehl is cogent and more compelling than the opposing rationale set forth in Rollins. We note that the district court in Rollins relied almost exclusively on federal precedent to support its position, whereas the matter at issue here — whether an arbitration agreement violates public policy — is properly a matter of state contract law. See Global Travel, 908 So.2d at 398 (“[R]ights of access to courts and trial by jury may be contractually relinquished [via an arbitration agreement], subject to defenses to contract enforcement including voidness for violation of the law or public policy, unconseionability, or lack of consideration.”); Powertel, 743 So.2d at 574 (“[T]he validity of an arbitration clause is ... an issue of state contract law.”). The Second District Court of Appeal has now acknowledged that its position in Rollins is in conflict with the decisions of the First, Fourth, and Fifth District Courts of Appeal, and we note that one of the Second District’s own judges, Judge Altenbernd, has suggested that the court abandon its position on this issue and adopt the approach of the other district courts.
Under the above standard of review, we hold that the district court in the present case erred in failing to rule that the trial court, not the arbitrator, must decide whether the arbitration agreement violates public policy.
III. LIMITATIONS OF REMEDIES
In this claim, Shotts contends that the district court erred in failing to rule that the limitations of remedies provisions in the present case violate public policy. This issue is a pure question of law, subject to de novo review. See Aills v. Boemi, 29 So.3d 1105, 1108 (Fla.2010). As noted above, the arbitration agreement in the present case contains the following limitations of remedies provisions: (1) “[t]he arbitration shall be conducted in accordance with the American Health Lawyers Association (‘AHLA’) Alternative Dispute Resolution Service Rules of Procedure for Arbitration”; and (2) “the arbitrators shall have no authority to award punitive damages.” The district court below did not decide whether these provisions violate public policy, but rather left that matter for the arbitrator to determine. Shotts contends that the district court erred in this respect — she contends that the limitations of remedies provisions in this case violate public policy, and that the district court should have so ruled. We agree.
A. Florida Case Law
Although this Court has not addressed the issue of whether a limitations of reme *472 dies provision in a nursing home arbitration agreement violates public policy, the matter has been addressed by Florida's district courts, and the decisions of those courts vary. The Second District Court of Appeal has confronted the issue on several occasions, but has never ruled on it, instead leaving the decision to the arbitrators in the various cases. That court’s' own position on the issue is unclear. On occasion, the court has indicated that such a provision might not violate public policy:
We are mindful that some courts, on public policy grounds, have refused to enforce remedial limitations in nursing home arbitration or have refused totally to order arbitration where such restrictions are present. The remedial limitations in nursing home arbitration may be troubling to some. After all, the Nursing Home Residents’ Rights Act is “[a] remedial statute ... designed to correct an existing law, redress an existing grievance, or introduce regulations conducive to the public good.” Unquestionably, the legislature enacted the statute to protect some of Florida’s most vulnerable residents. Arguably, therefore, the Agreement’s remedial limitations undermine the statute’s salutary purposes. While superficially appealing, the argument is too facile.
We also must recognize that Florida public policy favors arbitration. Nothing in the Nursing Home Residents’ Rights Act reflects a legislative hostility to arbitration. Moreover, as a general proposition, a party may waive statutory rights. The Nursing Home Residents’ Rights Act does not expressly prohibit a contractual waiver or limitation of statutory rights. The legislature could have included such a restriction in the Nursing Home Residents’ Rights Act. Accordingly, a compelling argument can be made that, absent a legislative restriction, the courts should honor a party’s decision to contract away statutory protections.
Bland, 927 So.2d at 257-58 (citations omitted) (quoting Lacey, 918 So.2d at 334). And yet in other cases, including the present case, the same district court has indicated that such a provision may well violate public policy.[7]
In contrast, other district courts of appeal have expressed a clear point of view on this issue. The First District Court of Appeal,[8] Fourth District Court of Appeal,[9] and Fifth District Court of Appeal,[10] have all held that a limitations of remedies provision in a nursing home (or assisted living facility) contract violates public policy. And although the Third District Court of Appeal has not addressed this matter from *473 a public policy perspective, it has ruled that a limitation of remedies provision in a nursing home contract is unenforceable as unconscionable,[11] as has the Fourth Dis-” trict Court of Appeal.[12]
The Fourth District Court of Appeal in Blankfeld v. Richmond Health Care, Inc., 902 So.2d 296 (Fla. 4th DCA 2005), stated its position with respect to limitations of remedies provisions and public policy:
A remedial statute is one which confers or changes a remedy. The Nursing Home Resident’s Act is remedial. The “Residents Rights” provisions in section 400.022 were enacted in 1980 to respond to a Dade County Grand Jury investigation of nursing homes which revealed detailed evidence of substantial elder abuse occurring in nursing homes. In 1993, the Legislature amended the statute by enacting section 400.023 (“Civil Enforcement”), providing civil remedies for nursing home residents for violation of the statute. A cause of action “may be brought in any court of competent jurisdiction to enforce such rights and to recover actual and punitive damages for any violation of the rights of a resident or for negligence.”
If nursing home residents had to arbitrate under the NHLA rules [now known as the AHLA rules[13]], some of the remedies provided in the legislation for negligence would be substantially affected and, for all intents and purposes, eliminated. The provision requiring arbitration under those rules is accordingly contrary to the public policy behind the statute and therefore void. Mullis v. State Farm Mut. Auto. Ins. Co., 252 So.2d 229, 235 (Fla.1971) (insurance policy provision limiting uninsured motorist protection provided in statute held void as contrary to public policy); Holt v. O’Brien Imps. of Fort Myers, Inc., 862 So.2d 87 (Fla. 2d DCA 2003) (automobile purchase contract providing for arbitration which limited remedies provided by Florida Deceptive and Unfair Trade Practices Act held void as contrary to public policy); see also Green v. Life & Health of America, 704 So.2d 1386, 1390 (Fla.1998) (parties can contract around state or federal law except where such a contract provision would be void as contrary to public policy).
Blankfeld, 902 So.2d at 298-99 (citations omitted) (quoting § 400.023(1), Fla. Stat. (2001)). The above rationale is echoed in the decisions of the First District Court of Appeal, Fourth District Court of Appeal, and Fifth District Court of Appeal.[14]
*474 With respect to the specific limitations of remedies provisions in the present case, all the above district courts, with the exception of the Second District Court of Appeal, have held that those provisions violate public policy or are otherwise unenforceable. The Fourth District Court of Appeal[15] and the Fifth District Court of Appeal[16] have held that the first provision — “[t]he arbitration shall be conducted in accordance with the American Health Lawyers Association (‘AHLA’) Alternative Dispute Resolution Service Rules of Procedure for Arbitration” — violates public policy. The First District Court of Appeal[17] and the Fourth District Court of Appeal[18] have held that the latter provision — “the arbitrators shall have no authority to award punitive damages” — violates public policy. And the Third District Court of Appeal[19] and the Fourth District Court of Appeal[20] have held that the latter provision is unenforceable as unconscionable.
B. The Present Case
Based on the foregoing, we conclude that the limitations of remedies provisions in the present case violate public policy, for they directly undermine specific statutory remedies created by the Legislature. See §§ 400.022, 400.028, Fla. Stat. (2008). This conclusion comports with the vast weight of authority in Florida, as discussed above. The Fourth District Court of Appeal in Romano v. Manor Care, Inc., 861 So.2d 59 (Fla. 4th DCA 2003), explained succinctly:
Sections 400.022 and 400.023 are remedial statutes, designed to protect nursing home residents. The Nursing Home Resident’s Rights Act, section 400.022, was originally enacted after a Dade County Grand Jury investigation of nursing homes revealed substantial elder abuse occurring in many nursing homes without any remedial action being taken. The law set up rights of residents, including the right to appropriate medical care, and requires nursing homes to make public statements of the rights and responsibilities of the residents. To enforce these rights, the legislature provided each resident with a cause of action for their violation.... The legislature also provided for the award of punitive damages for gross or flagrant conduct or conscious indifference to the rights of the resident. Moreover, there was no cap on pain and suffering damages in the statute.
Romano, 861 So.2d at 62-63 (emphasis added) (citations omitted).
In light of the recognized need for these remedies and the salutary purpose they serve, we conclude that any arbitration agreement that substantially diminishes or circumvents these remedies stands in violation of the public policy of the State of Florida and is unenforceable. In this re *475 spect, we find the rationale of the Fourth District Court of Appeal in BlankfelcL and Romano cogent and compelling. Under the above standard of review, we hold that the district court below erred in failing to rule that the limitations of remedies provisions in the present case violate public policy.
IV. SEVERABILITY
In this claim Shotts contends that the district court below erred in ruling that the limitations of remedies provisions in the present ease are severable. To the extent this claim is based on written materials before this Court, the issue is a pure question of law, subject to de novo review. See Aills v. Boemi, 29 So.3d 1105, 1108 (Fla.2010). The trial court below held that the provisions were not severable. The district court reversed. The district court held that, if the arbitrator were to conclude that these provisions violate public policy, they are severable. Shotts contends that the district court erred in so ruling — she contends that these limitations of remedies provisions violate public policy and are not severable. We agree.
A. Florida Case Law
Although this Court has not addressed the specific issue of whether a limitations of remedies provision that violates public policy is severable from the remainder of an arbitration agreement, this Court has set forth the following general standard for determining whether a contractual provision is severable from the whole:
As to when an illegal portion of a bilateral contract may or may not be eliminated leaving the remainder of the contract in force and effect, the authorities hold generally that a contract should be treated as entire when, by a consideration of its terms, nature, and purpose, each and all of its parts appear to be interdependent and common to one another and to the consideration. Stated differently, a contract is indivisible where the entire fulfillment of the contract is contemplated by the parties as the basis of the arrangement. On the other hand, a bilateral contract is sever-able where the illegal portion of the contract does not go to its essence, and where, with the illegal portion eliminated, there still remains of the contract valid legal promises on one side which are wholly supported by valid legal promises on the other.
Whether a contract is entire or divisible depends upon the intention of the parties. And this is a matter which may be determined by a fair construction of the terms and provisions of the contract itself, and by the subject matter to which it has reference.
Local No. 234 v. Henley & Beckwith, Inc., 66 So.2d 818, 821-22 (Fla.1953) (citations and internal quotation marks omitted).
Florida’s district courts have specifically addressed the issue of whether a limitations of remedies provision that violates public policy in a nursing home contract is severable from the remainder of an arbitration agreement, and the decisions of those courts vary. The First District Court of Appeal has held that such a provision is severable, where the agreement itself contained a severability clause. See Linton (finding severability where contract included severability clause and provisions that capped noneconomic damages at $250,000 and waived punitive damages). And the Second District Court of Appeal has held that such a provision is severable, regardless of whether the agreement contained a severability clause and even when it included a nonseverability clause. See Gessa v. Manor Care of Fla., Inc., 4 So.3d 679 (Fla. 2d DCA 2009) (finding severability where contract capped noneconomic *476 damages, precluded punitive damages, and had no severability clause), quashed, 86 So.3d 484 (Fla.2011); Stiehl (finding sever-ability where contract capped noneconomic damages, precluded punitive damages, and had a nonseverability clause).
In the present case, the Second District Court of Appeal ruled as follows with respect to the limitations of remedies provisions in the arbitration agreement:
In our de novo review, we conclude that the trial court erred when it found the offensive arbitration clauses could not be severed from the remainder of the arbitration agreement. We hold that the remedial limitation provisions which state that the arbitration agreement be conducted in accordance with the AHLA Procedures and that “arbitrators shall have no authority to award punitive damages” are not so interrelated and interdependent with the remainder of the arbitration agreement that they cannot be severed by the arbitrators if necessary. We note that the agreement anticipates the use of AHLA procedures but specifies that damages “shall be determined in accordance with the provisions of Florida law applicable to comparable civil action, except [for punitive damages].” Nothing suggests that the arbitrators could not easily resolve this case using proper elements of damage under Florida law and with the appropriate burden of proof.
Shotts, 988 So.2d at 643-44.
In counterpoint to the above decisions of the First District Court of Appeal and Second District Courts of Appeal, other district courts of appeal have ruled otherwise on this issue. The Fourth District Court of Appeal has held that a limitation of remedies provision is not severable, regardless whether the agreement contained a severability clause. See Hanson, 953 So.2d 773 (rejecting severability where contract contained a severability clause and a provision that adopted the AHLA rules); Lacey, 918 So.2d 333 (rejecting severability where contract contained no severability clause and contained provisions that capped noneconomic damages at $250,000 and waived punitive damages). And the Fifth District Court of Appeal has held that such a provision is not severable, regardless of whether the agreement contained a severability clause. See Fletcher, 952 So.2d 1225 (rejecting severability where contract, contained a severability clause and provisions that capped noneco-nomic damages at $250,000 and waived punitive damages); Stokes, 935 So.2d 1242 (rejecting severability where contract contained no severability clause and contained provisions that capped noneconomic damages at $250,000 and waived punitive damages).
The Fourth District Court of Appeal in Place at Vero Beach, Inc. v. Hanson, 953 So.2d 773 (Fla. 4th DCA 2007), addressed a limitations of remedies provision imposing the AHLA rules, and the district court ruled as follows:
This court’s recent decision in Blankfeld v. Richmond Health Care, Inc., [902 So.2d 296 (Fla. 4th DCA 2005)], sheds light on the issue before us. The arbitration provision in Blankfeld stated: “[A]ny action, dispute, claim or controversy of any kind ... now existing or hereafter arising between the parties ... shall be resolved by binding arbitration administered by the [AHLA].” This court determined that AHLA Section 606 rendered the provision unenforceable. Section 606 provides:
[T]he arbitrator may not award consequential, exemplary, incidental, punitive or special damages against a party unless the arbitrator determines, based on the record, that there is clear and convincing evidence that *477 the party against whom such damages are awarded is guilty of conduct evincing an intentional or reckless disregard for the rights of another party or fraud, actual or presumed.
However, the Nursing Home Resident’s Act, found in section 400.023(2), Florida Statutes, calls for a preponderance of the evidence standard. Based on this difference, this court determined that the arbitration provision was unenforceable.
Unlike the provision in Blankfeld, the provision in the Agreement in this case stated it was governed by Florida law, addressed compensatory or punitive damages or attorney’s fees, and referenced Chapter 400. The Place argues that the language in the provision stating, “[t]his agreement shall be governed by and interpreted in accordance with the laws of the State of Florida,” means the parties have entered into a written agreement to vary the AHLA rules. The Place also argues that the language stating that an award which is tied to a violation of Chapter 400 should be in accord with Chapter 400, incorporates Florida law into the agreement. We disagree.
The arbitration provision in the Agreement does not constitute a written agreement to vary the AHLA rules. The language regarding Florida law is standard and is meant to guide an arbitrator in interpreting the rest of the agreement. Moreover, contrary to the Place’s assertion, the provision does not read “arbitration ‘shall be governed by and interpreted in accordance with the laws of the state of Florida.’ ” We find the trial judge was correct in finding that the arbitration provision is in conflict with the NHRA and is unenforceable.
The Place argues further that the trial court, using the severability clause in the agreement, should have severed the portion of the arbitration agreement which detailed that the AHLA and its rules should be used in arbitrating any disagreement. “As a general rule, contractual provisions are severable, where the illegal portion of the contract does not go to its essence, and, with the illegal portion eliminated, there remain valid legal obligations.” Fonte v. AT & T Wireless Servs., Inc., 903 So.2d 1019, 1024 (Fla.2005).
The trial judge determined, unlike the agreement addressed in Fonte, he would have to rewrite the terms of the Agreement to give it effect. We find the trial court correctly refused to sever portions of the arbitration clause. While the Agreement did contain a severability clause, the clause allows provisions, not portions of provisions, of the Agreement to be severed. While in some cases offending sentences can be severed from a provision, these are instances in which there is no “interdependence between the arbitration clause and the remaining clauses of the agreement which would [require] the trial court to rewrite or ‘blue pencil’ the agreement.” Healthcomp Evaluation Serv. Corp. v. O’Donnell, 817 So.2d 1095, 1097 (Fla. 2d DCA 2002). In this case, the arbitration clause is built around the Place’s intent that the AHLA and its rules would control the arbitration. The trial judge correctly determined that he would be unable to simply sever a sentence from the provision, but would be forced to add the requirements that Chapter 400 and the Florida rules of arbitration would apply.
Hanson, 953 So.2d at 774-76 (citations omitted).[21]
*478 The Fifth District Court of Appeal in Fletcher v. Huntington Place Limited Partnership, 952 So.2d 1225 (Fla. 5th DCA 2007), also addressed the severance of such a provision:
Nor does it make sense for a court to remake [the nursing home’s] agreement to excise the offending provisions. Given the nature of the relationship between a nursing home and its patient, the courts ought to expect nursing homes to proffer form contracts that fully comply with Chapter 400, not to revise them when they are challenged to make them compliant. Otherwise, nursing homes have no incentive to proffer a fair form agreement.
Fletcher, 952 So.2d at 1227.
B. The Present Case
Based on the foregoing, we conclude that the limitations of remedies provision in the present case that calls for the imposition of the AHLA rules is not sever-able from the remainder of the agreement. Although the arbitration agreement in this case contains a severability clause, the AHLA provision goes to the very essence of the agreement. If the provision were to be severed, the trial court would be forced to rewrite the agreement and to add an entirely new set of procedural rules and burdens and standards, a job that the trial court is not tasked to do. See Local No. 234, 66 So.2d at 821-22.
Further, if the AHLA provision were severed, the trial court would be hard pressed to conclude with reasonable certainty that, with the illegal provision gone, “there still remains of the contract valid legal promises on one side which are wholly supported by valid legal promises on the other,” id. — particularly, when those legal promises are viewed through the eyes of the contracting parties. See generally id. at 822. Accordingly, we conclude that the rationale expressed by the Fourth District Court of Appeal in Hanson is cogent and compelling. We note that the trial court below ruled that the limitations of remedies provisions in the present case are not severable — and we agree with that assessment. Under the above standard of review, we hold that the district court below erred in ruling that the AHLA provision in this case is severable.
V. RENT-A-CENTER V. JACKSON
Approximately two weeks after this Court heard oral argument in the present case, the United States Supreme Court issued its decision in Rent-A-Center, West, Inc. v. Jackson, — U.S. -, 130 S.Ct. 2772, 177 L.Ed.2d 403 (2010), in which that Court addressed the issue of whether the court or the arbitrator must determine whether an arbitration agreement is unconscionable (Jackson contended that the agreement was unconscionable under Nevada law because it required the splitting of arbitration fees) where the agreement contained a provision, known as a delegation provision, in which the parties specifically agreed to arbitrate the enforceability of the arbitration agreement. The United States Supreme Court held that, where there has been no specific challenge to the delegation provision, the arbitrator, not the court, must decide the issue.
After Jackson was decided, this Court sua sponte requested supplemental briefing from the present parties to address whether Jackson is applicable to the present case. In its supplemental brief, OP Winter Haven contends that under Jackson the arbitrator, not the court, must decide whether the present arbitration *479 agreement violates public policy because although Shotts challenged the arbitration agreement, she failed to challenge the specific arbitration “clause” under which the parties agreed to arbitrate this dispute. We disagree.
In Jackson, after Antonio Jackson filed an employment discrimination claim against Rent-A-Center, West, Inc., which was his former employer, Rent-A-Center filed a motion to compel arbitration pursuant to the Mutual Agreement to Arbitrate Claims that Jackson had signed as a condition of his employment. The agreement contained a delegation provision in which the parties agreed to arbitrate the enforceability of the agreement. Jackson did not challenge the delegation provision specifically; rather, he opposed the motion on the ground that the entire arbitration agreement was unconscionable. The federal district court granted the motion, and the circuit court of appeals reversed. The United States Supreme Court granted cer-tiorari and reversed, ruling that the delegation provision was controlling.
The United States Supreme Court in Jackson engaged in a three-step analysis of the Rent-A-Center arbitration agreement under section 2 of the FAA. First, that Court reviewed the arbitration agreement under the key language of section 2 and noted that the agreement was multifaceted for section 2 purposes:
The Agreement here contains multiplé “written provision[s]” to “settle by arbitration a controversy.” Two are relevant to our discussion. First, the section titled “Claims Covered By The Agreement” provides for arbitration of all “past, present or future” disputes arising out of Jackson’s employment with Rent-A-Center. Second, the section titled “Arbitration Procedures” provides that “[t]he Arbitrator ... shall have exclusive authority to resolve any dispute relating to the ... enforceability ... of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable.” The current “controversy” between the parties is whether the Agreement is unconscionable. It is the second provision, which delegates resolution of that controversy to the arbitrator, that Rent-A-Center seeks to enforce. Adopting the terminology used by the parties, we will refer to it as the delegation provision.
Jackson, 130 S.Ct. at 2777 (citations omitted).
Second, that Court examined its own precedent in this area and reiterated the basic contours of federal arbitration law arising from section 2:
There are two types of validity challenges under § 2: “One type challenges specifically the validity of the agreement to arbitrate,” and “[t]he other challenges the contract as a whole, either on a ground that directly affects the entire agreement (e.g., the agreement was fraudulently induced), or on the ground that the illegality of one of the contract’s provisions renders the whole contract invalid.” Buckeye [Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 444, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006)]. In a line of cases neither party has asked us to overrule, we held that only the first type of challenge is relevant to a court’s determination whether the arbitration agreement at issue is enforceable. See Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 403-404, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967); Buckeye, supra, at 444-446, 126 S.Ct. 1204; Preston v. Ferrer, 552 U.S. 346, 353-354, 128 S.Ct. 978, 169 L.Ed.2d 917 (2008). That is because § 2 states that a “written provision” “to settle by arbitration a controversy” is “valid, irrevocable, and enforceable” without mention of the va *480 lidity of the contract in which it is contained. Thus, a party’s challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate. “[A]s a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract.” Buckeye, 546 U.S., at 445, 126 S.Ct. 1204; see also id., at 447, 126 S.Ct. 1204 (the severability rule is based on § 2).
Jackson, 130 S.Ct. at 2778 (footnote omitted).
And finally, the United States Supreme Court superimposed the above section 2 template onto the arbitration agreement in Jackson:
Here, the “written provision ... to settle by arbitration a controversy,” 9 U.S.C. § 2, that Rent-A-Center asks us to enforce is the delegation provision— the provision that gave the arbitrator “exclusive authority to resolve any dispute relating to the ... enforceability ... of this Agreement.” The “remainder of the contract,” Buckeye, supra, at 445, 126 S.Ct. 1204, is the rest of the agreement to arbitrate claims arising out of Jackson’s employment with Rent-A-Center. To be sure this case differs from Prima Paint, Buckeye, and Preston, in that the arbitration provisions sought to be enforced in those cases were contained in contracts unrelated to arbitration — contracts for consulting services, see Prima Paint, supra, at 397, 87 S.Ct. 1801, check-cashing services, see Buckeye, supra, at 442, 126 S.Ct. 1204, and “personal management” or “talent agent” services, see Preston, supra, at 352, 128 S.Ct. 978. In this case, the underlying contract is itself an arbitration agreement. But that makes no difference. Application of the severability rule does not depend on the substance of the remainder of the contract. Section 2 operates on the specific “written provision” to “settle by arbitration a controversy” that the party seeks to enforce. Accordingly, unless Jackson challenged the delegation provision specifically, we must treat it as valid under § 2, and must enforce it under [the other provisions of the FAA], leaving any challenge to the validity of the Agreement as a whole for the arbitrator.
Jackson, 130 S.Ct. at 2779 (footnote omitted) (citations omitted). Because Jackson challenged the arbitration agreement as a whole, but not the delegation provision specifically, he was entitled to no relief.
In the present case, because the arbitration agreement contained no delegation provision, there was no such provision for Shotts to challenge. Instead, she challenged the arbitration agreement itself. This was the proper course of action under the section 2 template, for unlike the situation in Jackson, the entire arbitration agreement in the present case operated as the “written provision ... to settle by arbitration a controversy,” in the section 2 lexicon. To the extent OP Winter Haven now claims that it is entitled to relief under Jackson because Shotts failed to challenge the particular arbitration “clause”— as opposed to the arbitration “agreement” — under which the parties agreed to arbitrate this dispute, this claim lacks merit. OP Winter Haven has failed to point to the particular “clause” to which it is referring and has failed to distinguish this clause in any meaningful way from the agreement itself. The present case thus differs from Jackson in this respect, and the decision in Jackson is inapplicable here.
VI. CONCLUSION
Based on the foregoing, we conclude that the district court in the present case *481 erred in the following respects: (i) in failing to rule that the trial court, not the arbitrator, must decide whether the arbitration agreement in this case violates public policy, (ii) in failing to rule that the limitations of remedies provisions in the present case violate public policy, and (iii) in ruling that the limitations of remedies provision that imposes the AHLA rules in the present case is severable. We also conclude that the United States Supreme Court’s decision in Rent-A-Center, West, Inc. v. Jackson, — U.S. -, 130 S.Ct. 2772, 177 L.Ed.2d 403 (2010), is inapplicable here.
We quash the decision of the district court in Shotts v. OP Winter Haven, Inc., 988 So.2d 639 (Fla. 2d DCA 2008).
It is so ordered.
LEWIS, QUINCE, and LABARGA, JJ, concur.
PARIENTE, J., concurs in result.
POLSTON, J., dissents with an opinion, in which CANADY, C.J., concurs.

. The respondents here include the following entities: OP Winter Haven, Inc.; RE Winter Haven, Inc.; Tandem Regional Management of Florida, Inc.; Tandem Health Care, Inc.; Gail Ward a/k/a Gail Lurie Ward; Nancy C. Thompson; Michael Bradley; and Irena Blackburn a/k/a Irena Tarran Blackburn (as to Tandem Health Care of Winter Haven). In this opinion, the respondents are referred to collectively as OP Winter Haven, Inc., or OP Winter Haven.

. Shotts raises the following claims: (a) the present district court decision conflicts with decisions of this Court and other district courts on the issue of which party bears the burden of proving an agent's authority under a power of attorney; (b) the present district court decision conflicts with decisions of this Court and other district courts on the issue of whether the authority issued through a power of attorney is to be strictly construed; (c) the present district court decision conflicts with decisions of other district courts on the issue of whether the arbitration agreement was unenforceable as contrary to public policy; (d) the present district court decision conflicts with decisions of this Court which hold that it is for the court, not the arbitrator, to decide whether an arbitration agreement is enforceable; (e) the present district court decision conflicts with decisions of other district courts with respect to the showing that is required to support a finding of unconsciona-bility; and (f) the present district court decision conflicts with decisions of other district courts on the issue of whether contract provisions that violate public policy are severable.

. We address, in the following order, claims (d), (c) and (f). We decline to address the remainder of Shotts’ claims.

. See, e.g., Manor Care, Inc. v. Estate of Kuhn, 23 So.3d 773, 774 (Fla. 2d DCA 2009); Jaylene, Inc. v. Steuer, 22 So.3d 711, 713 (Fla. 2d DCA 2009); Bland v. Health Care & Retirement Corp. of Am., 927 So.2d 252, 257-58 (Fla. 2d DCA 2006).

. See Jaylene, 22 So.3d at 713 ("We note that we are in conflict with decisions by the First, *467 Fourth, and Fifth Districts holding that the trial court initially must determine whether an arbitration agreement’s limitation on statutory remedies renders the agreement unenforceable on public policy grounds.”).

. See, e.g., Place at Vero Beach, Inc. v. Hanson, 953 So.2d 773 (Fla. 4th DCA 2007) (affirming the trial court’s ruling that the arbitration agreement conflicted with the Florida Nursing Home Residents Act and was unenforceable); Fletcher v. Huntington Place Ltd. P'ship, 952 So.2d 1225 (Fla. 5th DCA 2007) (reversing the trial court’s ruling compelling arbitration and instead holding that a limitations of remedies provision in a nursing home contract violates public policy and is void); Alterra Healthcare Corp. v. Estate of Linton, 953 So.2d 574, 578 (Fla. 1st DCA 2007) ("The issue of whether the provision violated public policy goes to the first Seifert inquiry: whether there was a valid agreement to arbitrate. This is a question for the trial court.”); Alterra Healthcare Corp. v. Bryant, 937 So.2d 263, 267 (Fla. 4th DCA 2006) (”[T]he trial court properly considered whether the arbitration and limitation of liability provisions were valid.”); SA-PG-Ocala, LLC v. Stokes, 935 So.2d 1242, 1243 (Fla. 5th DCA 2006) ("It is the court’s obligation, in deciding a motion to compel arbitration, to determine whether a valid written agreement to arbitrate exists.”); Lacey v. Healthcare & Retirement Corp. of Am., 918 So.2d 333 (Fla. 4th DCA 2005) (reversing the trial court’s ruling compelling arbitration and instead holding that a limitations of remedies provision in a nursing home contract violates public policy and is void); Blankfeld v. Richmond Health Care, Inc., 902 So.2d 296 (Fla. 4th DCA 2005) (same).

. See, e.g., Jaylene, 22 So.3d at 713 ("[W]e share the circuit court's concern over the limits of liability...."); Stiehl, 22 So.3d at 99 ("Additionally, courts in this state have specifically found arbitration agreements containing remedial limitations similar to those presented here to render an agreement to arbitrate void and unenforceable."); Shotts, 988 So.2d at 643 ("Because it appears that provisions of this agreement may violate public policy, we consider the issue of severability. ..."); id. at 644 ("It is possible, especially if Ms. Shotts pursues a claim for punitive damages, that portions of the arbitration agreement could be found to be against public policy.... ”).

. See Alterra Healthcare Corp. v. Estate of Linton, 953 So.2d 574, 578 (Fla. 1st DCA 2007).

. See Place at Vero Beach v. Hanson, 953 So.2d 773 (Fla. 4th DCA 2007); Alterra Healthcare Corp. v. Bryant, 937 So.2d 263 (Fla. 4th DCA 2006); Lacey v. Healthcare & Retirement Corp. of Am., 918 So.2d 333 (Fla. 4th DCA 2005); Blankfeld v. Richmond Health Care, Inc., 902 So.2d 296 (Fla. 4th DCA 2005).

. See Fletcher v. Huntington Place Ltd. P’ship, 952 So.2d 1225 (Fla. 5th DCA 2007); SA-PG-Ocala, LLC v. Stokes, 935 So.2d 1242, 1243 (Fla. 5th DCA 2006).

. See Prieto v. Healthcare and Retirement Corp. of Am., 919 So.2d 531 (Fla. 3d DCA 2005).

. See Romano v. Manor Care, Inc., 861 So.2d 59 (Fla. 4th DCA 2003).

. See Shotts, 988 So.2d at 642.

. See, e.g., Linton, 953 So.2d at 578 ("The arbitration agreement in the present case defeats the remedial purpose of the Act by eliminating punitive damages and capping noneconomic damages, so the trial court correctly ruled that it was void as against public policy.”); Bryant, 937 So.2d at 266 (“This court has held repeatedly that arbitration agreements eliminating punitive damages and capping non-economic damages defeat the remedial purpose of the NHRA and are, therefore, void as against public policy.”); Stokes, 935 So.2d at 1243 ("It would be against public policy to permit a nursing home to dismantle the protections afforded patients by the Legislature through the use of an arbitration agreement.”); Lacey, 918 So.2d at 334 ("To the extent that a contractual limitation defeats the purpose of a remedial statute, the limitation may be found void as a matter of law.... [The arbitration agreement here] eliminates punitive damages, which are expressly provided for in the Act. It also caps non-economic damages at $250,000, which would seem to substantially affect the compensatory damage remedy. These provisions are thus void under the public policy rationale utilized in this dis *474 trict.”); Romano, 861 So.2d at 62 ("Although parties may agree to arbitrate statutory claims, even ones involving important social policies, arbitration must provide the prospective litigant with an effective way to vindicate his or her statutory cause of action in the arbitral forum. When an arbitration agreement contains provisions which defeat the remedial provisions of the statute, the agreement is not enforceable.”) (citations omitted).

.See Hanson, 953 So.2d 773; Blankfeld, 902 So.2d 296.

. See Fletcher, 952 So.2d 1225; Stokes, 935 So.2d 1242.

. See Linton, 953 So.2d 574.

. See Bryant, 937 So.2d 263; Lacey, 918 So.2d 333.

. See Prieto, 919 So.2d 531.

. See Romano, 861 So.2d 59.

. See also Blankfeld, 902 So.2d at 298 ("Requiring clear and convincing evidence of in *478 tentional or reckless misconduct [pursuant to the AHLA rules] effectively eliminates recovery for negligence, and is contrary to the Nursing Home Residents Act....”).