Filed 5/27/15  HCF Ins. Agency v. Patriot Underwriters CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| HCF INSURANCE ANGENCY, | B257715 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC521271) |
| v. | |
| PATRIOT UNDERWRITERS, INC., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Richard Edward Rico, Judge.  Affirmed.

Chamberlin Keaster & Brockman, Robert W. Keaster and Michael A. Miller for Defendant and Appellant.

Winget Spadafora & Schwartzberg, Brandon S. Reif, David Maurer and Rafael DeAquino Villar for Plaintiff and Respondent.

# I. INTRODUCTION

Defendant, Patriot Underwriters, Incorporated, appeals from an order partially denying its amended motion to compel arbitration against plaintiff, HCF Insurance Agency. Plaintiff filed a first amended complaint containing multiple causes of action against defendant and other parties. As to defendant, plaintiff alleges the following causes of action: contract breach (first); breach of the implied covenant of good faith and fair dealing (second); fraud (third); intentional interference with economic advantage (fourth); and unlawful group boycott in violation of Business and Professions Code section 16720 et seq., also known as the Cartwright Act (ninth). Defendant moved to compel arbitration pursuant to an agreement signed by plaintiff. The trial court ordered arbitration as to the contract and implied covenant breach claims because those two causes of action were within the scope of the arbitration agreement. The trial court denied the arbitration petition as to the fraud and intentional interference with economic advantage causes of action. The trial court ruled those two claims did not fall within the scope of the arbitration agreement. The trial court also denied the arbitration petition as to the Cartwright Act cause of action. The trial court ruled application of the arbitration clause's Florida choice-of-law provision prevented plaintiff from securing any relief. The trial court found the group boycott claim involved an important public policy because it is California's antitrust statute. We affirm the order partially denying defendant's motion to compel arbitration.

# II. BACKGROUND

## A. Plaintiff's Allegations

On September 12, 2013, plaintiff filed its complaint. Defendant moved to compel arbitration on October 25, 2013. Plaintiff subsequently filed a first amended complaint on December 16, 2013, against: defendant; Intercare Specialty Risk Services, its

fictitious business names and successors in interest; Kevin Hamm, president and chief shareholder of Intercare Specialty Risk Services; Renee Iaia, president of Phoenix Risk Management Insurance Services, a related business to Intercare Specialty Risk Services; and Shomer Insurance Agency, Incorporated. We will focus on plaintiff's claims against defendant.

Plaintiff provides brokerage and agency services for casualty, accident and health, property, life and surplus lines of insurance. Plaintiff is a California corporation with its principal place of business in Los Angeles. Plaintiff is authorized to conduct business in California. Shomer Insurance Agency, Incorporated and Intercare Specialty Risk Services are direct competitors with plaintiff in the insurance market in the greater Los Angeles area. They specialize in brokering workers' compensation policies for extended care facilities. Defendant had a sub-producer agreement with Intercare Specialty Risk Services and Shomer Insurance Agency, Incorporated.

Defendant is a Delaware corporation with its principal place of business in Fort Lauderdale, Florida. Defendant is a program administrator and managing general underwriter servicing regional and national workers' compensation insurance carriers. Defendant provides products to insurance agencies and wholesalers with expertise in workers' compensation. Defendant also offers services such as claims and risk management. Defendant is in competition with other managing general underwriters in California such as Safety National Casualty Company.

Defendant specializes in the creation and management of new individual, agency, or group captive insurers for workers' compensation. A captive insurer is a dedicated in-house subsidiary entity which provides insurance to its owner, a parent corporation. The parent corporation pays premiums to the captive insurer rather than an outside firm to insure some business risk. The captive insurer reinvests the premiums it receives and then pays claims by drawing on the principal and return on its investment. Captive insurers can lower costs and facilitate coverage for certain hard-to-insure risks that traditional carriers may not underwrite.

Around July 2012, defendant considered entering into a business relationship with plaintiff. The enterprise was to involve plaintiff's healthcare-based workers' compensation business. Defendant's former regional vice president, David Duvall, requested significant proprietary information. The request was made so defendant could evaluate whether to enter into a group or agency captive insurer agreement. The proprietary information disclosed included five years of confidential client lists, effective dates, premiums, payroll figures and loss ratios. On August 27, 2012, plaintiff and defendant entered into a sub-producer agreement. The August 27, 2012 sub-producer agreement was a precursor to forming captive insurer agreements. The August 27, 2012 sub-producer agreement allowed plaintiff to access defendant's products directly without going through competitors like Intercare Specialty Risk Services or Shomer Insurance Agency, Incorporated. Plaintiff and defendant expected to execute an agency captive insurer agreement in November 2012. Within the first few months after the August 27, 2012 sub-producer agreement was entered into, plaintiff submitted substantial "business" to defendant.

Around late August or early September of 2012, Intercare Specialty Risk Services and Shomer Insurance Agency, Incorporated employees learned of plaintiff's anticipated captive insurer agreement with defendant. Intercare Specialty Risk Services and Shomer Insurance Agency, Incorporated employees agreed to exert pressure on defendant to exclude plaintiff as their brokerage market competitor. During or around September or October 2012, Mr. Hamm telephoned Steve Mariano, defendant's chief executive officer. Mr. Hamm threatened to "pull business" from defendant if it did not cancel its sub-producer agreement with plaintiff. An unidentified employee of Shomer Insurance Agency, Incorporated also communicated with defendant to cease "doing business" with plaintiff.

Defendant agreed to cancel the sub-producer agreement because of the threats of Intercare Security Risk Services' and Shomer Insurance Agency, Incorporated's employees. An unspecified employee of defendant instructed Mr. Duvall not to discuss these conversations with individuals employed by plaintiff. In November 2012, Jason

4

Adelman, plaintiff's president, asked Mr. Duvall if defendant had approved the captive insurer agreement. Mr. Duvall reiterated that Mr. Mariano, defendant's chief executive officer, had approved it. In December 2012, defendant refused to enter into a captive insurer agreement with plaintiff. Defendant refused to do so despite numerous representations the captive insurer agreement was approved and finalized. On or around January 1, 2013, defendant terminated the sub-producer agreement. As previously noted, plaintiff alleges the following causes of action against defendant: contract breach (first); implied covenant breach (second); fraud (third); intentional economic advantage interference (fourth); and unlawful group boycott in violation of the Cartwright Act under Business and Professions Code section 16720, et seq. (ninth). Because they are the relevant factual matters in this appeal, we will discuss the allegations in the third, fourth and ninth cause of action in detail.

The allegations in the third cause of action for fraud are difficult to follow. But the following are the relevant allegations. Since 2012, discussions between unspecified employees of plaintiff and defendant were held about entering into a captive insurer agreement. As part of that process, plaintiff shared confidential information with defendant. As noted, Mr. Duvall was defendant's former regional vice-president. On August 27, 2012, Mr. Duvall told Mr. Adelman, plaintiff's president, that defendant had approved group and agency captive insurer agreements. Thereafter for several weeks, Mr. Duvall made similar statements. As late as October 19, 2012, Mr. Duvall relayed a statement by Mr. Mariano, defendant's chief executive officer, of the approval of the agency captive insurer agreement with plaintiff. However, Mr. Mariano's statements were false and he knew them to be so. The purpose of Mr. Mariano's false statements was to: continue negotiation between plaintiff and defendant; maintain the appearance of good faith; keep plaintiff from securing workers' compensation insurance for its clients; continue securing confidential information from plaintiff; and further the boycott's objectives. (We will describe the boycott allegations shortly.) Had unidentified employees of plaintiff known that Mr. Mariano's statements concerning the agency

5

captive insurer agreement were untrue, negotiations would have ceased. Plaintiff would have pursued other agency opportunities with other companies.

For the intentional economic advantage interference cause of action, plaintiff alleges unidentified employees were having similar discussions regarding captive insurer agreements with Safety National Insurance. Plaintiff provided National Safety Insurance with significant confidential information. Defendant knew: of the economic relationship between plaintiff and National Safety Insurance; plaintiff had a significant and profitable "book of business" with National Safety Insurance; and the economic relationship between plaintiff and National Safety Insurance would be interrupted if Mr. Mariano's false statements concerning the captive insurer agreement turned out to be true. By its actions, defendant disrupted and interfered with plaintiff's economic relationship with Safety National Insurance. Defendant caused plaintiff to suspend its negotiations regarding entering a captive insurer agreement with Safety National Insurance.

As to the group boycott antitrust claim, plaintiff alleges, Intercare Specialty Risk Services and Shomer Insurance Agency Incorporated are horizontal competitors. Intercare Specialty Risk Services and Shomer Insurance Agency Incorporated entered into an agreement to threaten defendant. The first amended complaint describes the relationship between plaintiff, Intercare Specially Risk Services and Shomer Insurance Agency Incorporated as follows: "At all relevant times, . . . Intercare [Specialty Risk Services] and Shomer [Insurance Agency Incorporated] provided brokerage services and sold various lines of specialized commercial insurance products to a significantly overlapping base of actual or potential customers in direct competition with [plaintiff]. In some cases, [plaintiff], Intercare [Specially Risk Services] and Shomer [Insurance Agency Incorporated] were all brokers for defendant." According to the first amended complaint, Intercare Specially Risk Services and Shomer Insurance Agency Incorporated entered into an agreement to threaten defendant. The purpose of the threat was to force defendant to terminate plaintiff's existing sub-producer agreement. The threat was designed to remove plaintiff as a competitor of Intercare Specially Risk Services and Shomer Insurance Agency Incorporated. The first amended complaint describes the

6

threat thusly: "To remove [plaintiff] as a direct competitor for brokering workers' compensation coverage to extended care facilities, Intercare [Specialty Risk Services] and Shomer [Insurance Agency Incorporated], as horizontal competitors, entered into an agreement to threaten [defendant], and demand that, unless [defendant] terminated [plaintiff's] existing Producer Agreement and refused to engage in further dealings with [plaintiff], Intercare [Specialty Risk Services] and Shomer [Insurance Agency Incorporated] would cease to provide brokerage services and stop doing business with [defendant]. Intercare [Specialty Risk Services'] and Shomer [Insurance Agency Incorporated's] accounts represent a substantial portion of [defendant's] book of business."

In January 2013, defendant terminated the existing sub-producer agreement with plaintiff. Defendant stopped doing business with plaintiff in furtherance of the unlawful group boycott. Plaintiff was thereby denied important access to defendant's unique captive insurer products. Plaintiff's ability to compete has been severely impaired by defendant's conduct. Plaintiff alleges the foregoing anticompetitive conduct produced an antitrust injury.

### B.  Defendant's Initial and Amended Motion to Compel Arbitration

As noted, on October 25, 2013, defendant moved to compel arbitration. After plaintiff filed its first amended complaint, defendant filed its amended motion to compel arbitration on January 21, 2014. Defendant asserted the sub-producer agreement between plaintiff and defendant contained an arbitration provision.

At Section XVIII, entitled, "ARBITRATION," the sub-producer agreement provides, "(A)  If any dispute, claim or difference arises out of or relates in any fashion or manner to this Agreement (referred to herein after as a 'dispute', including a dispute for which a party seeks specific performance, such Dispute shall be [submitted] to arbitration." At Section XIX, entitled, "APPLICABLE LAW," the sub-producer agreement provides:  "If any question arises at any time as to the validity, construction,

7

interpretation or performance of this Agreement, the law of the State of Florida shall govern and control, without regard to its conflicts of law principles. The laws of the State of Florida shall be the exclusive law governing any dispute arising under this contract to the exclusion of the laws of any other state or jurisdiction." Under the choice-of-law provision, defendant asserted its motion to compel arbitration pursuant to the Revised Florida Arbitration Code. (Fla. Stats., § 682.01 et seq.) On March 20, 2014, plaintiff filed its opposition. Plaintiff argued the arbitration clause was unconscionable. Plaintiff asserted California law must apply because the choice of law provision violates fundamental public policy. Plaintiff contended that its antitrust cause of action would be de facto waived if Florida law applied.

### C. Order Denying in Part Defendant's Amended Motion to Compel Arbitration

On May 22, 2014, following a hearing, the trial court granted in part defendant's amended motion to compel arbitration. The amended motion to compel arbitration was granted as to plaintiff's first and second causes of action for contract and implied covenant breach respectively. The trial court ruled the first and second causes of action clearly arise from and relate to the sub-producer agreement. The amended motion to compel arbitration was denied as to the third, fourth and ninth causes of action. The trial court concluded the third and fourth causes of action did not arise from or relate to the sub-producer agreement under Florida law. The trial court found that enforcing the choice of law provision for the ninth cause of action would create a fundamental conflict with California law and denied the motion to compel arbitration. Proceedings concerning the third, fourth and ninth causes of action were stayed pending resolution of arbitration as to the first and second causes of action. Defendant timely appealed the partial denial of its amended motion to compel arbitration.

# III.  DISCUSSION

## A.  The Amended Motion to Compel Arbitration is Not Equivalent to Demurrer or Answer

Defendant argues plaintiff should have sought leave of court to file its first amended complaint.  Defendant has failed to identify any provision of Florida law that supports this contention.  But even if California law applies, defendant's contention has no merit.  Defendant relies on Code of Civil Procedure section 472, which provides, "Any pleading may be amended once by the party of course, and without costs, at any time before the answer or demurrer is filed, or after demurrer and before the trial of the issue of law thereon . . . ."  Defendant also relies upon Code of Civil Procedure section 1281.7, which provides, "A petition pursuant to Section 1281.2 [to compel arbitration] may be filed in lieu of filing an answer to a complaint."  Defendant argues that under these two sections, a petition to compel arbitration is a proper responsive pleading.  Under defendant's reasoning, since the petition to compel arbitration is like an answer, plaintiff should have been required to seek leave of court before amending its complaint.

Plaintiff contends defendant failed to preserve this issue on appeal by not raising it before the trial court and thus waiving it.  We agree.  Defendant never objected to the filing of plaintiff's first amended complaint.  Defendant cites to a declaration from its counsel, who declared:  "Plaintiff's First Amended Complaint was filed without leave of Court after [defendant] filed its original Motion to Compel Arbitration."  This is neither an objection nor is it an argument.  It is undisputed plaintiff did not seek leave of the trial court to file the first amended complaint.  Nowhere in the declaration nor in any of defendant's papers filed in the trial court does defendant complain that plaintiff's amendment was improper.

Even if this issue was properly raised, we disagree with defendant's argument.  Code of Civil Procedure section 422.10 provides, "The pleadings allowed in civil actions are complaints, demurrers, answers, and cross-complaints."  Code of Civil Procedure

9

section 422.10 unambiguously defines what pleadings are.  Motions, such as the petition to compel arbitration, are not listed therein.  No California statute states a motion to compel arbitration is the equivalent of an answer or a demurrer.  Defendant relies on *Simmons v. Allstate Insurance Co.* (2001) 92 Cal.App.4th 1068, 1073 (*Simmons*) and argues litigants may not "amend[] around" well-taken motions.  In *Simmons*, the defendant, at the hearing on a section 425.16 special motion to strike, was denied leave to amend his cross-complaint.  (*Id.* at p. 1072.)  Here, no such facts are present.  The concerns raised by the special motion to strike are inapplicable here.  No error occurred in connection with the filing of the first amended complaint without the trial court's permission.

### B.  Legal Standard for Arbitration

#### 1.  Florida's appellate standard of review of arbitration issues

We apply the following standard of review under Florida law to the issue of whether the parties agreed to arbitrate the fraud and economic interference causes of action:  "The question of whether a disputed issue is subject to arbitration is a matter of contract interpretation, and our review is *de novo.  Ocwen Fed. Bank FSB v. LVWD, Ltd.*, 766 So.2d 248, 249 (Fla. 4th DCA 2000).  In *Citigroup, Inc. v. Boles*, 914 So.2d 23 (Fla. 4th DCA 2005), this court discussed the application of arbitration provisions:  [¶] Notwithstanding that arbitration is favored in the law, construction of an arbitration clause remains subject to the contract law requirement 'that the court discern the intent of the parties from the language used in their agreement.'  *Citigroup, Inc. v. Amodio*, 894 So.2d 296, 298 (Fla. 4th DCA 2005).  '[A]rbitration is mandatory only where the subject matter of the controversy falls within what the parties have agreed will be submitted to arbitration.'  *Ocwen Fed. Bank FSB v. LVWD, Ltd.*, 766 So.2d 248, 249 (Fla. 4th DCA 2000).  '[I]t is the language of the agreement that defines the scope of an arbitration agreement.'  *Amodio,* 894 So.2d at 298."  (*Florida Environmental Services, Inc. v.*

*Rentoumis* (Fla.Dist.Ct.App. 2007) 950 So.2d 466, 470.) Under Florida law, in determining whether a cause of action is within the scope of an arbitration agreement, we examine the factual allegations of the first amended complaint. (*Ibid.*; *Singer v. Gaines* (Fla.Dist.Ct.App. 2005) 896 So.2d 851, 854.)

In addition, the Federal Arbitration Act applies to this action. "Section 2 of the [Federal Arbitration Act] . . . declares that a written agreement to arbitrate in any contract involving interstate commerce or a maritime transaction 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract[]' . . . ." (*Volt Information Services, Inc. v. Board of Trustees of Leland Stanford Junior University* (1989) 489 U.S. 468, 474 (*Volt*), citing 9 U.S.C. § 2.) As previously stated, plaintiff is a California corporation with its principle place of business in Los Angeles, California. Defendant is a Delaware corporation with its principle place of business in Fort Lauderdale, Florida. Our case arises from a contract evidencing a transaction involving commerce.

The United States Supreme Court held: "The [Federal Arbitration Act] was designed 'to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate,' [citation], and place such agreements '"upon the same footing as other contracts,"' [citations]." (*Volt, supra*, 489 U.S. at p. 478.) "Arbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit. Just as they may limit by contract the issues which they will arbitrate, [citation], so too may they specify by contract the rules under which that arbitration will be conducted. Where, as here, the parties have agreed to abide by state rules of arbitration, enforcing those rules according to the terms of the agreement is fully consistent with the goals of the [Federal Arbitration Act] . . . ." (*Id.* at p. 479.) Unless subject to the limited preemptive effect of the Federal Arbitration Act, it is undisputed that the arbitration provision at issue is subject to Florida law.

Under Florida's arbitration statutes, the following are the controlling principles which apply to plaintiff's fraud and economic interference claims: "[T]here are three elements for courts to consider in ruling on a motion to compel arbitration of a given

11

dispute: (1) whether a valid written agreement to arbitrate exists; (2) whether an arbitrable issue exists; and (3) whether the right to arbitration was waived. (See *Terminix Int'l Co., LP v. Ponzio* (Fla.Dist.Ct.App. 1997) 693 So.2d 104, 106.)" (*Seifert v. U.S. Home Corp.* (Fla. 1999) 750 So.2d 633, 636 (*Seifert*).) The parties do not dispute the existence of a valid arbitration agreement, nor do they argue waiver of the right to arbitrate has occurred. As to whether an arbitrable issue exists, the Florida Supreme Court held: "[T]he determination of whether an arbitration clause requires arbitration of a particular dispute necessarily 'rests on the intent of the parties.' [Citations.] A natural corollary of this rule is that no party may be forced to submit a dispute to arbitration that the party did not intend and agree to arbitrate. [Citations.]" (*Id.* at p. 636; see *Seaboard Coast Line R.R. Co. v. Trailer Train Co.* (11th Cir. 1982) 690 F.2d 1343, 1352.) The Florida Supreme Court concluded in the context of "arising out of or relating to" agreements: "[E]ven in contracts containing broad arbitration provisions, the determination of whether a particular claim must be submitted to arbitration necessarily depends on the existence of some nexus between the dispute and the contract containing the arbitration clause. [¶] Disputes arise in many and varied contexts and the mere coincidence that the parties in dispute have a contractual relationship will ordinarily not be enough to mandate arbitration of the dispute. In other words, the mere fact that the dispute would have arisen but for the existence of the contract and consequent relationship between the parties is insufficient by itself to transform a dispute into one 'arising out of or relating to' the agreement. [Citations.] These cases hold that for a tort claim to be considered 'arising out of or relating to' an agreement, it must, at a minimum, raise some issue the resolution of which requires reference to or construction of some portion of the contract itself. [Citations.]" (*Seifert*, *supra,* 750 So.2d at p. 638; see *Hersman, Inc. v. Fleming Cos., Inc.* (M.D.Ala. 1998) 19 F.Supp.2d 1282, 1286-1287.)

## 2. Fraud cause of action

Here, the arbitration clause applied to "any dispute, claim, or difference aris[ing] out of or relat[ing] in any fashion or manner to" the sub-producer agreement. The third cause of action alleges defendant made false representations regarding entering into an agency captive insurer agreement. The proposed agency captive insurer contract is different from the sub-producer agreement. The alleged misrepresentations caused plaintiff to forego other agency captive insurer or similar agreements. The third cause of action concerns issues with defendant's conduct as to the proposed agency captive insurer agreement. This does not arise out of or relate to the sub-producer agreement.

Defendant contends that plaintiff cannot distinguish Florida cases that have held fraud claims fall within the broad scope of the arbitration clause at issue here. Defendant's argument is unmeritorious. Florida courts have held that fraud claims are related to broad arbitration clauses because the deceit allegedly induced the contract formation or actually involved interpretation of the agreement. (See *Jackson v. Shakespeare Foundation, Inc.* (Fla. 2013) 108 So.3d 587, 595 [party's fraud claim within scope of arbitration provision and inextricably intertwined with contract]; *Beazer Homes Corp. v. Bailey* (Fla.Dist.Ct.App. 2006) 940 So.2d 453, 459 [fraud in inducement claim was within broad arbitration clause as it could have been restated as contract breach claim]; *Passerrello v. Robert L. Lipton, Inc.* (Fla.Dist.Ct.App. 1997) 690 So.2d 610, 611 [fraud in inducement claim as to entire contract was within broadly stated arbitration clause].) Here, no such contractual nexus exists between the alleged fraud and the sub-producer agreement. Under Florida law, plaintiff's fraud claim does not "raise some issue the resolution of which requires reference to or construction of some portion of" the sub-producer agreement. (*Seifert*, *supra,* 750 So.2d at 638; see *Vernett v. American-Indian Enterprises, Inc.* (Fla.Dist.Ct.App. 2014) 152 So.3d 856, 858.)

13

3.  Intentional Prospective Economic Advantage Interference Cause of Action

The fourth cause of action alleges defendant interfered with plaintiff's economic relationship with Safety National Insurance.  As previously recounted, plaintiff was also discussing entering into a captive insurer agreement with Safety National Insurance. Because of Mr. Mariano's alleged misrepresentations concerning a potential agreement, plaintiff ceased its negotiations with Safety National Insurance.  This interference with a potential agreement with Safety National Insurance does not arise out of or relate to the sub-producer agreement.

Defendant's citation to Florida cases is unpersuasive.  None of the Florida cases support defendant's assertion.  (See *Xerox Corp. v. Smartech Document Management, Inc.* (Fla.Dist.Ct.App. 2007) 979 So.2d 957, 959-960 [intentional interference with advantageous business relationship claim fell within broadly stated clause]; *Henderson v. Idowu* (Fla.Dist.Ct.App. 2002) 828 So.2d 451, 453 [intentional interference with advantageous business relationship claim fell within broad arbitration clause because it related to employment contract containing the agreement to arbitrate].)  Here, plaintiff's intentional interference with prospective economic advantage cause of action has no nexus to the sub-producer agreement.  It does not require "reference to or construction of" the sub-producer agreement.  (*Seifert, supra,* 750 So.2d at 638; see *Kolsky v. Jackson* (Fla.Dist.Ct.App 2010) 28 So.3d 965, 969.)  The trial court did not err by finding this cause of action not arbitrable.

C.  Ninth Cause of Action

The ninth cause of action, violation of the Cartwright Act, raises different issues than the foregoing analysis concerning the third and fourth causes of action.  To begin with, the ninth cause of action arises out of or relates to the sub-producer agreement. Plaintiff alleges that defendant terminated the sub-producer agreement under threat from Intercare Specially Risk Services and Shomer Insurance Agency Incorporated.  This

14

cause of action thus necessarily requires "reference to or construction of" the sub-producer agreement as it relates to defendant. (*Seifert, supra,* 750 So.2d at p. 638; see *BKD Twenty-One Management Co., Inc. v. Delsordo* (Fla.Dist.Ct.App. 2012) 127 So.3d 527, 531.) Because the ninth cause of action arises out of or relates to the sub-producer agreement, under Florida contract law, it potentially is subject to the arbitration agreement.

Under Florida law, the controlling revision concerning enforcement of arbitration agreements is Florida Statutes section 682.02, subdivisions (1) and (2) which state: "(1) An agreement contained in a record to submit to arbitration any existing or subsequent controversy arising between the parties to the agreement is valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract. [¶] (2) The court shall decide whether an agreement to arbitrate exists or a controversy is subject to an agreement to arbitrate." Any inconsistency between Florida Statutes section 682.02 and the Federal Arbitration Act must be resolved in favor of the federal law. (*Rewards Hotel Management Company, LLC v. Elite General Contractors, Inc.* (Fla.Dist.Ct.App. 2003) 860 So.2d 1011, 1014; *Trojan Horse, Inc. v. Lakeside Games* (Fla.Dist.Ct.App. 1988) 526 So.2d 194, 196.) Under Florida law, any challenge to the *enforceability* of an arbitration agreement on public policy grounds is resolved by the trial court, not the arbitrator. (*Shotts v. OP Winter Haven, Inc.* (Fla. 2011) 86 So.3d 456, 471 (*Shotts*); *AMS Staff Leasing, Inc. v. Taylor* (Fla.Dist.Ct.App. 2015) 158 So.3d 682, 685.)

The Florida Supreme Court has held that an agreement to arbitrate is unenforceable if it violates public policy. (*Gessa v. Manor Care of Florida, Inc.* (Fla. 2011) 86 So.3d 484, 493 (*Gessa*); *Shotts, supra,* 86 So.3d at p. 465.) Under Florida law, an arbitration agreement violates public policy if it defeats the purpose of a remedial statute. (*McKenzie Checked Advance of Florida, LLC v. Betts* (Fla. 2013) 112 So.3d 1176, 1183; *Lacey v. Healthcare & Retirement Corp. of America* (Fla.Dist.Ct.App. 2005) 918 So.2d 333, 334.) Similarly, an arbitration agreement that diminishes or circumvents remedies provided by a remedial statute violates public policy and is thus unenforceable.

15

(*Gessa, supra*, 86 So.3d at p. 493; *Shotts, supra,* 86 So.3d at p. 474.)  A remedial statute is one that provides redress for a grievance or that confers or changes a remedy.  (*Capone v. Philip Morris USA, Inc.* (Fla. 2013) 116 So.3d 363, 376; *Blankfield v. Richmond Health Care, Inc.* (Fla.Dist.Ct.App. 2005) 902 So.2d 296, 298.)  A remedial statute provides regulations which are conducive to the public good.  (*Capone v. Philip Morris USA, Inc.*, *supra,* 116 So.3d at p. 376; *Lacey v. Healthcare & Retirement Corp. of America*, *supra,* 918 So.2d at p. 334.)

We now turn to Florida's antitrust laws to determine if their enforcement will diminish any of plaintiff's rights.  Florida has its own antitrust statutes.  (See *MYD Marine Distributor, Inc. v. Internat. Paint Limited* (Fla.Dist.Ct.App. 2011) 76 So.3d 42, 46; *Duck Tours Seafari, Inc. v. City of Key West* (Fla.Dist.Ct.App. 2004) 875 So.2d 650, 652.)  Florida Statutes section 542.18 states, "Every contract, combination, or conspiracy in restraint of trade or commerce in this state is unlawful."  Florida Statutes section 542.19 states, "It is unlawful for any person to monopolize, attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of trade or commerce in this state."  An unlawful horizontal restraint can occur when competitors conspire to induce an entity which deals with them to cease dealing with another market competitor.  (*Parts Depot Company, L.P. v. Florida Auto Supply, Inc.* (Fla.Dist.Ct.App. 1996) 669 So.2d 321, 324; *St. Petersburg Yacht Charters, Inc. v. Morgan Yacht, Inc.* (Fla.Dist.Ct.App. 1984) 457 So.2d 1028, 1040.)  Plaintiff argues that if Florida antitrust law applies, it cannot recover for losses incurred outside that state.  The only Florida antitrust decision expressly on point is *Oce Printing Systems USA, Inc. v. Mailers Data Services, Inc.* (Fla.Dist.Ct.App. 2000) 760 So.2d 1037, 1041, which holds:  "[I]t appears from the plain language of the Antitrust Act that it is aimed at regulating trade or commerce that occurs in Florida, regardless of where the contract, conspiracy, or monopoly occurs.  It is the effect on trade that must occur in Florida, not the actions giving rise to the effect on trade."].)  Plaintiff's alleged damages were sustained in California.  Plaintiff alleges it, Intercare Specialty Risk Services and Shomer Insurance Agency, Incorporated are competitors in the same insurance field in the greater Los

16

Angeles area.  Plaintiff alleges the misconduct all occurred in Los Angeles County.  Thus, plaintiff would be unable to state a claim under Florida Statutes, sections 542.18 and 542.19.  None of the allegations in the first amended complaint allege any effect on trade or commerce in Florida.  Under Florida antitrust law, plaintiff is unable to recover *any damages* for any of the conduct occurring in Los Angeles County.  Thus, under Florida law, the agreement to arbitrate plaintiff's antitrust claims violates that state's public policy.  Plaintiff cannot recover for any damages sustained in Los Angeles County arising from the alleged horizontal restraint on trade under Florida law.  Thus, as to plaintiff's horizontal restraint claims, the arbitration agreement is unenforceable.  We need not address the parties' alternative arguments concerning a violation of California's fundamental public policies.

## IV.  DISPOSITION

The order denying in part the amended motion to compel arbitration is affirmed. Plaintiff, HCF Insurance Agency, may recover its appeal costs from defendant, Patriot Underwriters, Incorporated.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

TURNER, P. J.

We concur:

KRIEGLER, J.

GOODMAN, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18